UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICOLE HAMILTON,

    Plaintiff,

v.

    Case No. 5:23-cv-12424

    Hon.

UNIVERSITY OF MICHIGAN BOARD
OF REGENTS,

    Defendant.

---

JENNIFER B. SALVATORE (P66640)
JESSICA LIEBERMAN (P68957)
ANNEMARIE SMITH-MORRIS (6336786)
SALVATORE PRESCOTT
PORTER & PORTER PLLC
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
salvatore@spplaw.com
lieberman@spplaw.com
smith-morris@spplaw.com

---

**COMPLAINT AND JURY DEMAND**

Plaintiff Nicole Hamilton, by and through her attorneys, SALVATORE PRESCOTT PORTER & PORTER, submits this Complaint and states as follows:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Nicole Hamilton worked as a Lecturer at the University of Michigan.

2. Defendant University of Michigan Board of Regents ("University of Michigan" or "University") is a public university headquartered in Washtenaw County, Michigan within the Eastern District of Michigan.

3. The alleged violations forming the basis of this action occurred in Washtenaw County, Michigan, which is within the Eastern District of Michigan.

4. Claims in this action are for retaliation in violation of Title VII of the Civil Rights Act of 1964; Title IX of the Education Amendments of 1972; and First Amendment Retaliation under 42 U.S.C. §§ 1983 and 1988.

5. This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331. Venue is appropriate under 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

*Plaintiff's professional background and employment with Defendant.*

6. In or around 2017, Plaintiff Nicole Hamilton began working as a Lecturer at the University of Michigan in the Department of Computer Science and Engineering.

7. This position was the capstone of a highly successful and esteemed career.

8. Ms. Hamilton earned her bachelor's and master's degrees in electrical engineering from Stanford University in 1973, and an MBA from Boston University in 1987.

9. Ms. Hamilton has eleven issued patents and her publications have received over 3,700 citations according to Google Scholar.

10. In addition, Ms. Hamilton has had a long career in industry and as an entrepreneur.

11. At Microsoft, Ms. Hamilton was the ninth member of the team that created the first release of the Bing search engine in 2004. She personally wrote the ranker and query compiler, roughly ten percent of the entire backend of the system. Her code decided what the user was looking for, searched the index, and then ordered the results.

12. Ms. Hamilton is also the author of Hamilton C shell, a well-known software product that she created in 1987.

13. Ms. Hamilton first began her teaching career at the University of Washington Bothell in 2013 in its electrical engineering department, becoming an affiliate lecturer teaching circuits, transistors and digital design.

14. In 2017, Ms. Hamilton was recruited by the Computer Science and Engineering (CSE) department at the University of Michigan. She was employed as

a full-time Lecturer III from September 2017 until 2021, teaching undergraduate computer science courses.

15. Ms. Hamilton most often taught the course entitled EECS 280 C++ and Object-Oriented Programming. This is a very large sophomore-level required course, typically with around 1000 students spread across five sections, with three or four instructors and around sixty student staff.

16. Ms. Hamilton also created and taught EECS 440 System Design of a Search Engine ("Search Engine course"). This was a Major Design Experience course she created based on her Microsoft experience, where students worked in teams of six to create an entire search engine from scratch. Top teams typically indexed five-hundred million or more pages, crawling the web with thousands of threads spread across a half dozen or more Amazon cloud machines.

17. The Search Engine course was a major achievement and her class was in high demand.

18. Ms. Hamilton's students consistently rated her very highly in their course evaluations and she is also well reviewed on the heavily utilized website, RateMyProfessors.com. In sum, she was a well-regarded instructor who brought unique skills and experience to her role.

19. Ms. Hamilton is a transgender woman. During her employment at the University of Michigan, her gender identity and her gender sometimes made her life

in the computer science department more difficult. She was one of very few women on faculty, and she frequently experienced disrespectful and unfair treatment that she attributed to gender bias. She escalated concerns to CSE's leadership about gender bias and discrimination, including to Chairs Brian Noble, Peter Chen and Michael Wellman, and to CSE's Human Resources (HR) representative Karen Liska.

20. In the spring of 2021, Plaintiff was denied promotion following her major review – the process for promotion within CSE.

21. As a result of this denial, Plaintiff's employment as a lecturer with Defendant ended.

22. Plaintiff believed that her major review failed and that her promotion was denied because of gender discrimination and/or in retaliation for her complaints of gender-based discrimination. She did not immediately take any steps to address this perceived retaliation, however.

23. A few weeks after Plaintiff's employment with the University ended, Professor Atul Prakash, then serving as Associate Department Chair, suggested the possibility of Plaintiff returning to teach her Search Engine course.

24. Specifically, on or around April 22, 2021, Prakash emailed Plaintiff, "I also have some hope that CSE can invite you back for teaching at your convenience, especially for the Search Engine course that you created once in a while."

25. The Search Engine course was very popular and was not taught by any other CSE faculty; many students had planned to enroll in it at the time Plaintiff departed her employment with Defendant and would not now get the opportunity to do so.

26. On or around July 1, 2021, Plaintiff followed up with Prakash to inquire whether teaching the Search Engines course was a real possibility. She inquired over email, "Is teaching my 440 search engine class sometime in the future an actual possibility or just musing?"

27. On or around July 6, 2021, Plaintiff and Prakash quickly reached an agreement for Plaintiff to teach the course in January (winter semester) of 2022 at forty percent of her previous salary.

28. The plan was for Plaintiff to hold a "temp lecturer position" but the exact title was not discussed. Prakash explained, "We could post for a temp lecturer position to teach the course for one term. … The salary would be whatever you were paid most recently at 40% rate. But unfortunately, the University does not offer fringe benefits such as health insurance at the 40% level."

29. Plaintiff was last paid $98,105 for fall 2020 and winter 2021 semesters. She calculated that the forty percent rate would yield $19,621 in pay to teach the Search Engines course.

30. Plaintiff responded, "That would work. I was never here for the money and at my age, I have Medicare."

31. On or around July 7, 2021, Plaintiff and Prakash agreed on the qualifications and language Prakash needed for a job posting that could only match one applicant: Plaintiff.

32. The tone of Prakash's engagement with Plaintiff throughout this time was collegial and warm, and he further informed Plaintiff that Professor Michael Wellman, Department Chair, was also agreeable to having Plaintiff teach the Search Engines course during the winter 2022 term.

33. Prakash extended further kindness to Plaintiff in the coming weeks when, in or around mid-August of 2021, he agreed to let Plaintiff use CSE department letterhead for writing letters of reference for former students and informed Plaintiff that he was working to restore her University of Michigan Google drive access.

***Plaintiff engages in protected conduct and is retaliated against.***

34. Although Plaintiff was pleased and encouraged to be given the opportunity to teach her Search Engines course in January of 2022, she remained distressed that her major review had failed, and her promotion had been denied.

7

35. Plaintiff continued to believe that the failure of her major review and denial of promotion were retaliatory based on her having complained to CSE leadership about gender-based discrimination.

36. Therefore, in or around September of 2021, Plaintiff submitted a complaint of sex discrimination and retaliation with Defendant's Office of Institutional Equity (OIE), subsequently renamed as the ECRT (Equity, Civil Rights and Title IX) Office.

37. On or around September 26, 2021, Plaintiff emailed Prakash and Michael Wellman, telling them she had reported a "concern" on the OIE site detailing her belief that the failure of her major review was discriminatory/retaliatory, and asking for a second chance on her major review.

38. Plaintiff's September 26th email to Prakash and Wellman included the complete text of the "concern" she had submitted to the OIE. Plaintiff also attached copies to this email of the same three supporting documents she had provided to OIE.

39. The text of Plaintiff's "concern" mentioned by name the two individuals she believed had been involved in discriminating and retaliating against her: Michael Wellman and Atul Prakash.

40. One of the three supporting documents Plaintiff had supplied to OIE— and that she now shared with Prakash and Wellman—was a January 8, 2021, email

from Plaintiff to Prakash in which she referenced an earlier complaint of gender discrimination that she believed Prakash had inappropriately used to encourage the major review committee not to promote her. The January 8th email also referenced what Plaintiff perceived as Prakash's own sexist behavior. Plaintiff had sent this email three weeks before the major review committee voted to deny her promotion, and it formed the basis of her retaliation complaint to OIE.

41. Immediately following Plaintiff's September 26, 2021, email to Prakash and Wellman referencing her OIE complaint, the relationship between Plaintiff and Prakash cooled.

42. Prakash made no further mention of restoring Plaintiff's Google drive access, and he engaged in no further discussion of Plaintiff ever returning to full-time status or of the Search Engine course being a recurring assignment—three possibilities he had raised with Plaintiff only a few months prior.

43. On or around October 18, 2021, Plaintiff applied for the "intermittent lecturer" position online and learned that CSE was proposing to pay eleven percent less than Plaintiff had been paid the last time she taught the course (and also less than she had been told she would be paid).

44. On or around the morning of October 18, 2021, Plaintiff emailed Prakash to express her concern about the salary, which was listed at $17,441.00.

Plaintiff pointed out that Prakash had told her in July that she would receive forty percent of her last pay rate, which would have come to $19,621.

45.     Liska later emailed Plaintiff to explain that she had converted Plaintiff's salary from 9 months to 12 months, then back to 4 as the length of the appointment.

46.     Plaintiff responded that the reduction was not acceptable and argued that the pay should be the same as it had been previously.

47.     In a follow-up email that same day, Plaintiff explained the logical error in Liska's formula, namely that she was averaging in a short summer semester even though Plaintiff's previous contract didn't include summer; she had last taught the class in the winter and would be teaching it in the winter once again.

48.     Overlapping Plaintiff's email, Liska responded to Plaintiff's email stating, "Please don't accuse me of making any decisions that affect your employment.  I am following standard UM processes and contractual limitations."

49.     Liska's assertion was false. In the final ECRT report, Prakash himself stated that Liska decided the title, salary and that an ad would have to be posted, even though the LEO union had offered to waive posting.

50.     Moreover, Liska was not "following standard UM processes and contractual limitations" in determining Plaintiff's pay. In a written statement to the ECRT, LEO president Kirsten Herold noted that the formula Liska had used was *not* university policy and that there were no such contractual limitations.  Herold called

the formula not just bogus but "absolute bullshit" and noted that she viewed it as part of a pattern of "nickeling and diming" Plaintiff and "putting [her] in [her] place" that also included the demotion of Plaintiff from Lecturer III to Lecturer I equivalent.

51. On or around October 18, 2021, Plaintiff responded to Liska's and Prakash's emails, striking a conciliatory tone.

52. Prakash then weighed in, adding that he could only offer the advertised amount for the position and asking Plaintiff to let him and Liska know if she still wished to apply.

53. Prakash's claim that he could only pay the advertised amount calculated in that way was also untrue.

54. Plaintiff followed up with Prakash and Liska, copying Herold as well as ECRT's Carrie Landrum. She suggested a formula whereby she would be paid $20,000 for teaching the course. She then added that she had her first Zoom meeting in a few days' time with Carrie Landrum in ECRT.

55. On or around October 20, 2021, Plaintiff submitted her Formal Complaint Form to Defendant's ECRT Office. The complaint specifically named Atul Prakash as the Respondent.

56. On or around October 21, 2021, Plaintiff participated in the Zoom meeting with ECRT's Carrie Landrum, who noted that Prakash would be informed of Plaintiff's complaint that day.

57. This was Prakash's second notification that he was personally named by Plaintiff as a respondent in her complaint of discrimination and retaliation, the first notice being Plaintiff's email of September 26, 2021.

58. On or around October 23, 2021, three days after she filed her formal complaint with Defendant, Plaintiff received an email from Prakash stating, "Nicole, after a careful thought on where to best focus our teaching resources and energy, we have decided to not offer EECS 440 in W22. We are no longer looking to fill the position advertised in Job opening 205310."

## COUNT I
## TITLE VII – RETALIATION

59. Plaintiff hereby incorporates all preceding paragraphs.

60. Plaintiff engaged in protected conduct when she submitted a complaint of gender-based discrimination and retaliation to Defendant's ECRT (Equity, Civil Rights and Title IX) Office.

61. Defendant knew about Plaintiff's protected conduct.

62. Defendant took adverse action against Plaintiff because of her protected conduct when it reduced her pay and diminished her title, and again when it revoked the offer for her to teach her EECS 440 Search Engine course.

63. Plaintiff's protected conduct motivated this retaliation by Defendant.

64. Defendant's retaliation against Plaintiff was intentional and/or was with reckless indifference to Plaintiff's rights.

65. As a direct and proximate result of Defendant's retaliation, Plaintiff has sustained damages including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

66. Plaintiff filed a charge with the EEOC, and on August 29, 2023, received a right to sue letter from the Agency, allowing her to bring suit under Title VII.

## COUNT II
## TITLE IX – RETALIATION

67. Plaintiff hereby incorporates all preceding paragraphs.

68. Defendant engaged in retaliation against Plaintiff when it reduced her pay and diminished her title, and again when it cancelled the EECS 440 Search Engine course, after Plaintiff pursued a complaint through Defendant's ECRT Office.

69. As a direct and proximate result of Defendant's retaliation, Plaintiff has sustained damages including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

## COUNT III
## FIRST AMENDMENT RETALIATION
## (42 U.S.C. §§ 1983 and 1988)

70. Plaintiff hereby incorporates all preceding paragraphs.

71. Defendant is a state actor, acting under color of law.

72. Plaintiff engaged in activity protected by the First Amendment to the U.S. Constitution, including the right to free speech, when she filed a complaint of discrimination and retaliation with Defendant's ECRT Office.

73. Defendant retaliated against Plaintiff for her First Amendment protected speech by reducing her pay and diminishing her title, and again by cancelling the EECS 440 Search Engine course. Plaintiff's constitutionally protected activity motivated Defendant's adverse actions. Thus, Defendant acted with a retaliatory intent and motive.

74. As a direct and proximate result of Defendant's retaliation, Plaintiff has sustained damages including lost wages and benefits, mental anguish, physical and emotional distress, humiliation, and embarrassment.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendant as follows:

a. economic and non-economic damages;

b. attorney fees and costs;

c. punitive damages; and

d. all other legal and equitable relief determined by the Court to be appropriate.

        Respectfully Submitted,

        /s/ Jennifer B. Salvatore
        Jennifer B. Salvatore (P66640)
        SALVATORE PRESCOTT
        PORTER & PORTER, PLLC
        Attorneys for Plaintiff
        105 East Main Street
        Northville, MI 48167
        (248) 679-8711
        salvatore@spplaw.com

Dated:  September 25, 2023

## **JURY DEMAND**

Plaintiff demands a trial by jury in the above-captioned matter.

Respectfully Submitted,

Dated:      September 25, 2023

Jennifer B. Salvatore (P66640)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
Attorneys for Plaintiff
105 East Main Street
Northville, MI 48167
(248) 679-8711
salvatore@sppplaw.com